JUSTICE NELSON,
dissenting.
¶61 I respectfully dissent from the Court’s decision.
I. INTRODUCTION
¶62 The Supreme Court[1] could not have been more clear in Citizens United v. Federal Election Commission,_U.S._, 130 S. Ct. 876 (2010): corporations have broad rights under the First Amendment to the United States Constitution to engage in political speech, and corporations cannot be prohibited from using general treasury funds for this purpose based on antidistortion, anticorruption, or shareholder-protection interests. The language of the Citizens United *245 majority opinion is remarkably sweeping and leaves virtually no conceivable basis for muzzling or otherwise restricting corporate political speech in the form of independent expenditures.[2]
¶63 As a result, the critical question presented in the case now before us is simply this: Has the State of Montana identified a compelling state interest, not already rejected by the Supreme Court, that would justify the outright ban on corporate expenditures for political speech effected by § 13-35-227(1), MCA? Having considered the matter, I believe the Montana Attorney General has identified some very compelling reasons for limiting corporate expenditures in Montana’s political process. The problem, however, is that regardless of how persuasive I may think the Attorney General’s justifications are, the Supreme Court has already rebuffed each and every one of them. Accordingly, as much as I would like to rule in favor of the State, I cannot in good faith do so.
¶64 The Court, on the other hand, views the matter differently. The Court concludes that Montana may bar corporations from using general treasury funds for political speech-Citizens United notwithstanding-because ‘Montana has unique and compelling interests to protect.” Opinion, ¶ 37. What “unique” interests render Montana exempt from Citizens United? One searches the Court’s Opinion in vain to find any. The Court states that Montana has “a clear interest in preserving the integrity of its electoral process” and “an interest in encouraging the full participation of the Montana electorate.” Opinion, ¶ 38. Yet, Montana is hardly unique in this regard. Every state in the Union is interested in preserving the integrity of its electoral process and in encouraging the full participation of its electorate. The Court asserts that Montana has interests in “protecting and preserving its system of elected judges,” “preserving the appearance of judicial propriety and independence so as to maintain the public’s trust and confidence,” and “protecting the due process rights of litigants.” Opinion, ¶¶ 39, 40, 45. But surely every state with an elected judiciary has these same interests. The Court also cites ‘the compelling interest of the people of Montana in strong voter participation in the process.” Opinion, ¶ 41. Again, however, the people of Montana are certainly not the only people in the United States with a compelling interest in strong voter participation. ¶65 The fact is that none of the interests identified by the Court are unique to Montana. What the Court is really saying is that Montana *246 has a unique history and unique qualities which make Montana uniquely susceptible to the corrupting influence of unlimited corporate expenditures. Indeed, the Court points to Montana’s history involving the Copper Kings-their bribery of public officials, their manipulation of state government, and their control over local judges in the late 1800s and early 1900s. Opinion, ¶¶ 22-28. Based on this history, the Court concludes that Montana voters ‘had a compelling interest to enact the challenged statute in 1912.’’Opinion, ¶ 36. Furthermore, the Court concludes that the dangers of corporate influence and domination still exist in Montana. Opinion, ¶¶ 29-31. In fact, the Court asserts that Montana is “especially vulnerable to continued efforts of corporate control to the detriment of democracy and the republican form of government.” Opinion, ¶ 37. According to the Court, this is owing to Montana’s sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs. Opinion, ¶ 37. Given these characteristics, the Court opines that unlimited corporate money would ‘irrevocably change the dynamic of local Montana political office races, which have historically been characterized by the low-dollar, broad-based campaigns run by Montana candidates.” Opinion, ¶ 38. Moreover, the infusion of unlimited corporate money in support of or opposition to a targeted candidate would “tninimize[ ] the impact of individual citizens” in the political process and leave the average citizen “effectively shut out of the process.” Opinion, ¶¶ 38, 41. Accordingly, the Court holds that Montana may flat-out prohibit direct political spending by corporations.
¶66 Respectfully, I cannot agree that this ‘Montana is unique” rationale is consistent with Citizens United. And I seriously doubt this rationale is going to prevail in the Supreme Court when this case is appealed, as it almost certainly will be. For one thing, a fair reading of the Citizens United majority opinion, coupled with a fair reading of the separate concurring and dissenting opinions, leads inescapably to the conclusion that every one of the Attorney General’s arguments-and this Court’s rationales adopting those arguments-was argued, considered, and then flatly rejected by the Supreme Court. Moreover, even accepting the propositions that Montana experienced an egregious period of corporate domination and political corruption at the turn of the 20th century, that Montana citizens understandably became fed up with the heavy-handed influence and corrupt practices of special interests at the time, and that Montana to this day remains especially vulnerable to continued efforts of corporate control, what the *247 Court and the Attorney General have failed to recognize is this fundamental point: a ban on corporate speech is not a constitutionally permissible remedy for these problems. This should be abundantly clear from the following passage in Citizens United:
If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by [the legislative branch] to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is our law and our tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech during the critical preelection period is not a permissible remedy.
130 S. Ct. at 911 (emphases added).
¶67 The federal law struck down in Citizens United (2 U.S.C. §441b, as amended by §203 of the Bipartisan Campaign Reform Act of 2002) prohibited corporations from expressly advocating the election or defeat of candidates and from broadcasting electioneering communications within 30 days of a primary election and 60 days of a general election. Citizens United, 130 S. Ct. at 887, 897. The Montana law at issue here is even more categorical, prohibiting corporations from ever using general treasury funds for political advocacy. Section 13-35-227(1), MCA (“A corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.’). If the federal law is facially unconstitutional, as the Supreme Court held, then I cannot envision any possibility that the Montana law will survive the predictable appeal of this Court’s decision.
¶68 Unquestionably, Montana has its own unique history. No doubt Montana also has compelling interests in preserving the integrity of its electoral process and in encouraging the full participation of its electorate. And Montana may indeed be more vulnerable than other states to corporate domination of the political process. But the notion argued by the Attorney General and adopted by the Court-fehat these characteristics entitle Montana to a special ‘ho peeing” zone in the First Amendment swimming pool4s simply untenable under Citizens United.
¶69 Admittedly, I have never had to write a more frustrating dissent. I agree, at least in principle, with much of the Court’s discussion and with the arguments of the Attorney General. More to the point, I *248 thoroughly disagree with the Supreme Court’s decision in Citizens United. I agree, rather, with the eloquent and, in my view, better-reasoned dissent of Justice Stevens. As a result, I find myself in the distasteful position of having to defend the applicability of a controlling precedent with which I profoundly disagree.[3]
¶70 That said, this case is ultimately not about my agreement or disagreement with the Attorney General or our satisfaction or dissatisfaction with the Citizens United decision. Whether we agree with the Supreme Court’s interpretation of the First Amendment is irrelevant. In accordance with our federal system of government, our obligations here are to acknowledge that the Supreme Court’s interpretation of the United States Constitution is, for better or for worse, binding on this Court and on the officers of this state, and to apply the law faithful to the Supreme Court’s ruling.
¶71 Granted, there are some in the legislative and executive branches of government who would call-and, in fact, have called-for Montana to thumb its nose at the federal government, to disregard federal law, and to boldly ignore the Supremacy Clause (U.S. Const., art. VI, cl. 2). See e.g. Mike Dennison, Bills Test State’s Power to Nullify Fed Laws, Helena Independent Record (Feb. 13,2011). Regardless of those views, however, all elected officials in Montana-legislative, executive, and judicial-are sworn to “support, protect and defend the constitution of the United States.”Mont. Const, art. Ill, §3. Obviously, this means in accordance with the Supreme Court’s interpretations of the United States Constitution. Thus, when the highest court in the country has spoken clearly on a matter of federal constitutional law, as it did in Citizens United, the highest court in Montana-fehis Court-is not at liberty to disregard or parse that decision in order to uphold a state law that, while politically popular, is clearly at odds with the Supreme Court’s decision. This is the rule of law and is part and parcel of every judge’s and justice’s oath of office to “support, protect and defend the constitution of the United States.” In my view, this Court’s decision today fails to do so.
¶72 The Supreme Court has emphatically rejected the notion that corporate political speech may be restricted based on interests in protecting against political and campaign corruption, safeguarding the ability of individual citizens to compete and participate in the political *249 process, and preserving judicial integrity and impartiality. It makes no sense whatsoever that a state may rely on these very same interests-despite their rejection by the Supreme Court-as grounds for muzzling corporate speech simply because the state’s history, demographics, economics, and elections are in some way “unique.” It also makes no sense that, on one hand, the First Amendment protects corporate expenditures for political speech at the federal level and, apparently, throughout the rest of the country[4] but that, on the other hand, this First Amendment protection magically evaporates at Montana’s borders because of a law adopted 100 years ago to address a very fact-specific situation. See Larry Howell, Once Upon a Time in the West: Citizens United, Caperton, and the War of the Copper Kings, at 6-16 (under the heading ‘The Montana Situation”) (available at http://mtlr.org). Indeed, if the Supreme Court countenances this Court’s approach of restricting corporate political speech rights based on population density, the existence of "mineral wealth,” a history of ‘low-dollar, broad-based campaigns,’’and past experience with ‘heavy-handed influence” asserted by corporations, then there shortly will be nothing left of Citizens United at the state level. Due to its unpopularity, the Supreme Court’s decision will be “state-lawed”into oblivion. While this would be a good thing in the view of many, my point here is that the Supreme Court clearly did not intend, with the broad, sweeping, and unqualified language it used, to allow the holding of Citizens United to be circumvented through “uniqueness” stratagems.
¶73 Therefore, and with all due respect to my colleagues, I believe this Court is simply wrong in its refusal to affirm the District Court. Like it or not, Citizens United is the law of the land as regards corporate political speech. There is no ‘Montana exception.” The proof of the Court’s error is found in a comparison of the rationales provided in the Court’s Opinion with the statements by the Supreme Court rejecting those rationales. I begin with an analysis of the Citizens United decision.
*250 II. CITIZENS UNITED
¶74 A significant portion of the Citizens United decision is devoted to the threshold question whether the Supreme Court should even be deciding the constitutional matters that it ultimately does decide. Indeed, the five Justices in the majority-justice Kennedy joined by Chief Justice Roberts, Justice Scalia, Justice Thomas, and Justice Alito-eonsumed numerous pages attempting to explain why they were (1) addressing a claim that Citizens United had expressly dismissed in the district court (its facial challenge to the law’s constitutionality), (2) deciding the case on grounds that arguably were broader than necessary to resolve Citizens United’s claim, and (3) overruling prior precedents notwithstanding the doctrine of stare decisis. See Citizens United, 130 S. Ct. at 888-96, 911-13 (majority opinion); 130 S. Ct. at 917-25 (Roberts, C.J., & Alito, J., concurring). With regard to these issues, the dissent-Justice Stevens joined by Justice Ginsburg, Justice Breyer, and Justice Sotomayor-accused the majority of simply being “unhappy with the limited nature of the case before us,” of having “disdain” for the prior precedents, and thus of “changing] the case to give themselves an opportunity to change the law.”[5] Citizens United, 130 S. Ct. at 932, 938. The dissent also criticized the majority’s determination to invalidate the statute on facial grounds, not only because this approach is “ ‘contrary to the fundamental principle of judicial restraint’ ’’and has the secondary effect of‘implicitly striking down a great many state laws as well,” but also because the record before the Supreme Court was “nonexistent.” Citizens United, 130 S. Ct. at 932-33. Whereas Congress had crafted the Bipartisan Campaign Reform Act of 2002 (BCRA) ‘in response to a virtual mountain of research on the corruption that previous legislation had failed to avert,” the majority ‘how negates Congress’ efforts without a shred of evidence on how §203 or its state-law counterparts have been affecting any entity other than Citizens United.” Citizens United, 130 S. Ct. at 933. The dissent argued that ‘it is the height of recklessness to dismiss Congress’ years of bipartisan deliberation and its reasoned judgment on this basis, without first confirming that the statute in question was intended to be, or will function as, a restraint on electoral competition.” Citizens United, 130 S. Ct. at 969. Finally, the dissent *251 argued that the case could have been decided on various narrower grounds, Citizens United, 130 S. Ct. at 936-38, and that the majority had failed to give proper deference to the doctrine of stare decisis, 130 S. Ct. at 938-42. On this latter point, the dissent observed that
[sJtare decisis protects not only personal rights involving property or contract but also the ability of the elected branches to shape their laws in an effective and coherent fashion. Today’s decision takes away a power that we have long permitted these branches to exercise. State legislatures have relied on their authority to regulate corporate electioneering, confirmed in [Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 110 S. Ct. 1391 (1990)], for more than a century. The Federal Congress has relied on this authority for a comparable stretch of time, and it specifically relied on Austin throughout the years it spent developing and debating BCRA. The total record it compiled was 100,000 pages long. Pulling out the rug beneath Congress after affirming the constitutionality of §203 six years ago shows great disrespect for a coequal branch.
Citizens United, 130 S. Ct. at 940 (emphasis in original, footnotes omitted).[6]
¶75 While I believe the Citizens United dissent makes a persuasive argument that the majority need not and should not have rendered such a broad constitutional holding, the fact remains that the majority did so, striking down the federal law as facially invalid. Thus, my focus hereafter is on what the majority specifically held regarding corporate independent expenditures on political speech. I approach this in step-by-step fashion.
A. The First Amendment Applies to Political Speech by Corporations
¶76 The First Amendment provides that ‘Congress shall make no law ... abridging the freedom of speech.” This protection extends to corporations and to the context of political speech. Citizens United, 130 *252 S. Ct. at 899, 900. Political speech does not lose First Amendment protection simply because its source is a corporation. Citizens United, 130 S. Ct. at 900. The identity of the speaker is not decisive in determining whether speech is protected; corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster. Citizens United, 130 S. Ct. at 900. The Supreme Court ‘has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not ‘natural persons.’ ” Citizens United, 130 S. Ct. at 900.
B. Section 441b Burdens Corporate Political Speech
¶77 The law at issue (2 U.S.C. §441b, as amended by §203 of the BCRA) prohibits corporations and unions from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of candidates. It also prohibits the broadcast of electioneering communications within 30 days of a primary election and 60 days of a general election. Citizens United, 130 S. Ct. at 887, 897. This prohibition on corporate independent expenditures is a ban on speech. Citizens United, 130 S. Ct. at 898. It is true that corporations and unions may establish a “separate segregated fund” (known as a political action committee or PAC) for purposes of express advocacy or electioneering communications. The moneys received by the PAC are limited to donations from stockholders and employees of the corporation or, in the case of unions, members of the union. Citizens United, 130 S. Ct. at 887-88. Nevertheless, §441b ‘is aban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak.” Citizens United, 130 S. Ct. at 897. This is because “[a] PAC is a separate association from the corporation. So the PAC exemption from § 441b’s expenditure ban does not allow corporations to speak.” Citizens United, 130 S. Ct. at 897 (citation omitted). Furthermore, Tejven if a PAC could somehow allow a corporation to speak-and it does not-the option to form PACs does not alleviate the First Amendment problems with § 441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations.” Citizens United, 130 S. Ct. at 897.
C. Standard of Review: Strict Scrutiny
¶78 “While it might be maintained that political speech simply cannot be banned or restricted as a categorical matter,’’the following standard “provides a sufficient framework for protecting the relevant First Amendment interests in this case.” Citizens United, 130 S. Ct. at 898. *253 Laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. Citizens United, 130 S. Ct. at 898.
D. The Governmental-Function Interest
¶79 The First Amendment prohibits restrictions that distinguish among different speakers, allowing speech by some but not others. Citizens United, 130 S. Ct. at 898. Hence, the government “may commit a constitutional wrong when by law it identifies certain preferred speakers.” Citizens United, 130 S. Ct. at 899. The Supreme Court has upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, but these rulings were based on “the proposition that there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech”-e.g., the function of public school education, the penological objectives of the corrections system, and the capacity of the government to discharge its military responsibilities. Citizens United, 130 S. Ct. at 899. This interest is not applicable here because the corporate independent expenditures at issue would not interfere with governmental functions. Quite the contrary, ‘it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes.” Citizens United, 130 S. Ct. at 899.
E. The Antidistortion Interest
¶80 The Supreme Court in Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 110 S. Ct. 1391 (1990), found a compelling governmental interest in preventing “‘the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public’s support for the corporation’s political ideas.’ ” Citizens United, 130 S. Ct. at 903 (quoting Austin, 494 U.S. at 660, 110 S. Ct. at 1397). The concerns in this regard are that corporations can “use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace,” and that corporate wealth can “dominat[e]... the political process” and “unfairly influence elections” when it is deployed in the form of independent expenditures. Austin, 494 U.S. at 659, 660, 110 S. Ct. at 1397, 1398 (internal quotation marks omitted).
¶81 The problem with this “antidistortion rationale,” however, is that it is inconsistent with the First Amendment. Citizens United, 130 S. Ct. at 904-08. For one thing, “ ‘the concept that government may *254 restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.’ ” Citizens United, 130 S. Ct. at 904 (alteration omitted) (quoting Buckley v. Valeo, 424 U.S. 1, 48-49, 96 S. Ct. 612, 649 (1976) (per curiam)).
Buckley rejected the premise that the Government has an interest ‘in equalizing the relative ability of individuals and groups to influence the outcome of elections.” Buckley was specific in stating that “the skyrocketing cost of political campaigns” could not sustain the governmental prohibition. The First Amendment’s protections do not depend on the speaker’s “financial ability to engage in public discussion.”
Citizens United, 130 S. Ct. at 904 (citations omitted).
¶82 Additionally, the antidistortion rationale interferes with the “open marketplace” of ideas protected by the First Amendment by permitting the government to ban the political speech of millions of associations of citizens. Citizens United, 130 S. Ct. at 906-07. Most of these are small corporations without large amounts of wealth-a fact which belies the argument that the statute at issue is justified on the ground that it prevents the “distorting effects of immense aggregations of wealth.” Citizens United, 130 S. Ct. at 907. In any event, political speech is indispensable to decision-making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. Citizens United, 130 S. Ct. at 904. ‘Corporations, like individuals, do not have monolithic views. On certain topics corporations may possess valuable expertise, leaving them the best equipped to point out errors or fallacies in speech of all sorts, including the speech of candidates and elected officials.” Citizens United, 130 S. Ct. at 912. By suppressing the speech of manifold corporations, both for-profit and nonprofit, the government prevents their voices and viewpoints from reaching the public and advising voters on which persons or entities are hostile to their interests. Citizens United, 130 S. Ct. at 907. In so doing, the government muffles the voices that best represent the most significant segments of the economy and deprives the electorate of information, knowledge, and opinion vital to its function. Citizens United, 130 S. Ct. at 907. When the government seeks to use its power “to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.” Citizens United, 130 S. Ct. at 908.
*255 F. The Anticorruption Interest
¶83 The Government argues that corporate political speech may be banned in order to prevent corruption or its appearance. The Buckley Court found this interest sufficiently important to allow limits on contributions. Citizens United, 130 S. Ct. at 908 (citing Buckley, 424 U.S. at 25, 96 S. Ct. at 638). But when the Buckley Court examined a ban on independent expenditures, it found “that the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify [the ban].” Buckley, 424 U.S. at 45, 96 S. Ct. at 647. For the reasons which follow, that holding is reaffirmed here. Citizens United, 130 S. Ct. at 908-11.
¶84 “‘The hallmark of corruption is the financial quid pro quo: dollars for political favors.’ ” Citizens United, 130 S. Ct. at 910 (quoting Fed. Election Commn. v. Natl. Conservative Political Action Comm., 470 U.S. 480, 497, 105 S. Ct. 1459, 1468 (1985)). “[C]ontribution limits,... unlike limits on independent expenditures, have been an accepted means to prevent quid pro quo corruption.” Citizens United, 130 S. Ct. at 909. Not only can large direct contributions be given to secure a political quid pro quo, the scope of such pernicious practices can never be reliably ascertained. Citizens United, 130 S. Ct. at 908 (citing Buckley, 424 U.S. at 26-27, 96 S. Ct. at 638). Thus, limits on direct contributions are permissible to ensure against the reality or appearance of quid pro quo corruption. Citizens United, 130 S. Ct. at 908.
¶85 Independent expenditures, in contrast, have a substantially diminished potential for abuse. Citizens United, 130 S. Ct. at 908. By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. Citizens United, 130 S. Ct. at 910. “ ‘The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.’ ” Citizens United, 130 S. Ct. at 908 (quoting Buckley, 424 U.S. at 47, 96 S. Ct. at 648). Limits on independent expenditures, therefore, “have a chilling effect extending well beyond the Government’s interest in preventing quid pro quo corruption.” Citizens United, 130 S. Ct. at 908.
¶86 “When Buckley identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption.” Citizens United, 130 S. Ct. at 909. Two years later, the Supreme Court purported to leave *256 open the possibility that corporate independent expenditures could be shown to cause corruption. See First Natl. Bank of Boston v. Bellotti, 435 U.S. 765,788 n. 26,98 S. Ct. 1407, 1422 n. 26 (1978). However, “we now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.” Citizens United, 130 S. Ct. at 909.
¶87 The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt. Citizens United, 130 S. Ct. at 910.
‘Favoritism and influence are not ... avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness.”
Citizens United, 130 S. Ct. at 910 (ellipsis in original) (quoting McConnell v. Fed. Election Commn., 540 U.S. 93, 297, 124 S. Ct. 619, 748 (2003) (Kennedy, J., Rehnquist, C. J., & Scalia, J., dissenting)). The appearance of influence or access, furthermore, will not cause the electorate to lose faith in our democracy. As noted, an independent expenditure is, by definition, political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker. Citizens United, 130 S. Ct. at 910.
¶88 In sum, the hallmark of corruption is the financial quid pro quo: dollars for political favors. Citizens United, 130 S. Ct. at 910. The government has a sufficiently important interest in preventing quid pro quo corruption or the appearance of it. Citizens United, 130 S. Ct. at 909. Indeed, a quid pro quo arrangement would be covered by bribery laws. Citizens United, 130 S. Ct. at 908. Independent expenditures, however, “do not lead to, or create the appearance of, quid pro quo corruption. In fact, there is only scant evidence that independent expenditures even ingratiate. Ingratiation and access, in any event, are not corruption.” Citizens United, 130 S. Ct. at 910 *257 (citation omitted). Therefore, ‘independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.” Citizens United, 130 S. Ct. at 909. Of course, if elected officials succumb to improper influences from independent expenditures, surrender their best judgment, and put expediency before principle, then surely there is cause for concern; but in attempting to dispel either the appearance or the reality of these influences, ‘ta]n outright ban on corporate political speech ... is not a permissible remedy.” Citizens United, 130 S. Ct. at 911.
G. The Shareholder-Protection Interest
¶89 The Government argues that corporate independent expenditures can be limited in the interest of protecting dissenting shareholders from being compelled to fund corporate political speech with which they do not agree. The First Amendment, however, does not allow the government to restrict corporate speech based on a shareholder’s disagreement with the political views of the corporation. Citizens United, 130 S. Ct. at 911. There is, furthermore, little evidence of abuse that cannot be corrected by shareholders through the procedures of corporate democracy. Citizens United, 130 S. Ct. at 911.
H. Foreign Influence
¶90 ‘We need not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation’s political process.” Citizens United, 130 S. Ct. at 911.
I. Conclusion
¶91 Based on the foregoing, the Supreme Court overruled its decision in Austin. ‘We return to the principle established in Buckley and Bellotti that the Government may not suppress political speech on the basis of the speaker’s corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.” Citizens United, 130 S. Ct. at 913 (emphasis added). Accordingly, the Supreme Court held that BCRA §203’s restriction on electioneering communications and 2 U.S.C. § 441b’s prohibition on the use of corporate treasury funds for express advocacy were both invalid. Citizens United, 130 S. Ct. at 913. The Supreme Court (with only Justice Thomas dissenting) then went on to uphold BCRA’s disclaimer and disclosure provisions against an as-applied constitutional challenge. Citizens United, 130 S. Ct. at 913-16.
III. THE PLAINTIFFS’ CLAIMS
¶92 Before examining this Court’s rationales upholding §13-35-227(1), *258 MCA,[7] it is necessary to dispel some misconceptions regarding the plaintiffs’ claims.
¶93 First, the Court asserts that neither Gary Marbut, the founder of Montana Shooting Sports Association (MSSA), nor Kenneth Champion, the sole shareholder of Champion Painting, Inc., has demonstrated “any material way” in which Montana law has hindered or censored their political activity or speech. Opinion, ¶ 17. Of course, Marbut and Champion are not parties to this lawsuit, and their speech rights are not at issue here. Hence, whether Marbut and Champion, as individuals, have been hindered or censored in their political activity or speech is totally irrelevant. The question is whether the speech rights of MSSA and Champion Painting, as incorporated entities, have been infringed.
¶94 Second, the Court asserts that MSSA has failed to demonstrate that its speech has been impaired by § 227 because Montana law places no restriction on MSSA to spend its members’ dues on political advocacy. Opinion, ¶ 17. As support for this, the Court cites the affidavit of former Commissioner of Political Practices Dennis Unsworth. What Unsworth specifically says, however, is this: TMSSA] has been and continues to be free to spend its member dues and donations from its treasury regardless of its corporate status, as long as it complies with the filing requirements described above and meets the criteria for a voluntary association.” (Emphasis added.) The affidavit of Mary Baker, program supervisor in the Office of the Commissioner of Political Practices, likewise states that “there is nothing in Montana’s campaign finance laws that would prohibit [MSSA] from registering itself as a committee and making independent expenditures from its corporate treasury, if it meets our office’s criteria for a voluntary association.”[8] (Emphasis added.) According to Unsworth’s affidavit, those criteria are as follows:
A voluntary association that incorporates can spend its *259 members’ dues and donations on campaign contributions and independent expenditures from its treasury, if it: (1) is formed for the express purpose of promoting political ideas, and could not engage in business activities; (2) has no shareholders or other persons affiliated so as to have a claim on its assets or earnings; (3) is not established by a business corporation, and does not accept contributions from business corporations.
¶95 Contrary to the Court’s implication, there has been no determination in this case that MSSA in fact meets the criteria of a “voluntary association.” And one of the exhibits attached to Unsworth’s affidavit indicates that MSSA does not satisfy the criteria. The exhibit is an “advisory opinion” issued by former Commissioner Linda Vaughey on September 25, 2003, in which she addresses whether the nonprofit corporation People for Responsible Government (PRG) may engage in political activities in connection with candidates for public office. Vaughey starts with the premise that §227 “appears on its face to prohibit all corporations, including nonprofit corporations, from making contributions or expenditures in connection with candidates, other than through separate, segregated funds.” Vaughey then observes that, based on Fed. Election Commn. v. Mass. Citizens for Life, Inc., 479 U.S. 238, 263-64, 107 S. Ct. 616, 631 (1986), there is an exception for nonprofit corporations which meet the three criteria listed above. Vaughey finally determines that PRG does not meet the third criterion because
[njothing in the Articles of Incorporation, the Bylaws, or the other information you have provided confirms that PRG was not established by a business corporation or a labor organization. Moreover, you have not provided any information establishing that PRG does not directly or indirectly accept donations or contributions of anything of value from business corporations or labor organizations. [Emphasis added.]
Likewise here, there is no evidence in the record-mot in Marbut’s affidavit, in MSSA’s Articles of Incorporation (attached to Marbut’s affidavit), in Unsworth’s affidavit, in Baker’s affidavit, or in any other document-establishing that MSSA “does not directly or indirectly accept donations or contributions of anything of value from business corporations or labor organizations.” Hence, MSSA does not qualify as a ‘Voluntary association” under the Commissioner’s definition, and MSSA is not allowed to use its general treasury funds to make independent expenditures in connection with candidate elections. MSSA states in the First Amended Complaint that it wishes to “use its *260 corporate funds to directly support or oppose candidates.” In light of the foregoing discussion, §227(1) bars MSSA from doing so. The Court is flat wrong, therefore, in stating that “the statute has no or minimal impact” on MSSA. Opinion, ¶ 46.
¶96 Third, the Court likewise misstates the impact on Champion Painting. For one thing, the Court again seems to be improperly focused on Champion’s speech rights, which are not at issue, rather than Champion Painting’s speech rights, which are at issue. Opinion, ¶ 18. The Court also suggests that the only reason Champion Painting is participating in this lawsuit is so that its shareholder (Champion) can be allowed to make “candidate endórsemenos]” using the company name. Opinion, ¶ 18. Finally, the Court asserts that because Champion, as sole shareholder, can simply establish a PAC to advocate for Champion Painting’s interests and expend funds that he will decide to contribute, Opinion, ¶ 18, “the statute has no or minimal impact on ... Champion,” Opinion, ¶ 46. The Court is wrong on all counts.
¶97 According to the First Amended Complaint,
Champion Painting intends to spend corporate funds to educate the citizens of Montana and Bozeman about political candidates and ballot issues that will either positively or negatively impact Montana’s small businesses, and Champion Painting intends to publicly support or oppose candidates and issues relating to Montana’s small businesses. The corporate funds will be spent to purchase TV spots and radio advertisements, and to create and distribute brochures and fliers ....
Champion’s affidavit is to the same effect: “In addition to being politically active as an individual, I would like for Champion Painting to be politically active. . . . Since Champion Painting is a small business, its voice will be more effective than my voice when supporting or opposing candidates who may have an impact on small businesses.” It is apparent, then, that Champion Painting’s claim is about the corporation’s ability to speak, not its shareholder’s ability to speak. And as the Court concedes, §227(1) forbids the expenditure of Champion Painting’s corporate funds to support or oppose candidates. Opinion, ¶ 18. Nothing in §227 exempts corporations held by a sole shareholder. As for the Court’s theory that Champion Painting could speak through a PAC, Opinion, ¶ 18, the Supreme Court rejected this approach as discussed above and noted again below.
IV. COMPARISON
¶98 I now turn to a comparison of the rationales provided in the *261 Court’s Opinion with the statements by the Supreme Court rejecting those rationales. Again, the specific issue is the constitutionality of § 227(1)’s prohibition on corporate expenditures in connection with a candidate or a political committee that supports or opposes a candidate or a political party. The disclosure laws, the prohibition on direct corporate contributions, and the Corrupt Practices Act as a whole have not been challenged. Opinion, ¶¶ 2, 8.
A. The Political Committee Alternative
¶99 Section 227(1) states that “[a] corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.” Section 227(3), however, provides that “[t]his section does not prohibit the establishment or administration of a separate, segregated fund [known as a political committee or PAC] to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from an individual who is a shareholder, employee, or member of the corporation.” See Opinion, ¶ 4.
¶100 The Court asserts that, in Montana, political committees are “easy to establish,”“easy to use,” and an “effective alternative to direct corporate spending for engaging in political speech.” Opinion, ¶¶ 21, 47. The Supreme Court, however, stated: “A PAC is a separate association from the corporation. So the PAC exemption from [the law’s] expenditure ban does not allow corporations to speak.” Citizens United, 130 S. Ct. at 897 (citation omitted). Moreover, “[e]ven if a PAC could somehow allow a corporation to speak — and it does not^.he option to form PACs does not alleviate the First Amendment problems.” Citizens United, 130 S. Ct. at 897 (emphasis added).
¶101 The Court ignores the Supreme Court’s holding that a PAC is “separate” from the corporation and, thus, is not a valid alternative to direct corporate expenditures. Indeed, the Court asserts that the Supreme Court rejected PACs ‘because of the burdensome, extensive, and expensive Federal regulations that applied.” Opinion, ¶ 12. This is false. Granted, the Supreme Court briefly noted that ‘PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations.” Citizens United, 130 S. Ct. at 897. Yet, even if federal PACs were as “easily implemented” as the Court says Montana’s PACs are, Opinion, ¶ 21, the fundamental problem with PACs still remains: “A PAC is a separate association from the corporation. So the PAC exemption from [the law’s] expenditure ban does not allow corporations to speak.” Citizens United, 130 S. Ct. at *262 897 (citation omitted). Bottom line: ‘[Section 227(1)] is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation [as permitted under § 227(3)] can still speak.” Citizens United, 130 S. Ct. at 897. The Court’s contrary holding is plainly wrong.
B. Anticorruption and Restraining Corporate Influence
¶102 The Court cites various examples of “well-financed corruption” perpetrated by F. Augustus Heinze, the Anaconda Company, and W. A. Clark. Opinion, ¶¶ 23-28. Notably, some of these examples involved blatant bribery and quid pro quo corruption (i.e., dollars for political favors), but it is not clear that any of them involved independent expenditures (i.e., political speech presented to the electorate that is not coordinated with a candidate) in exchange for political favors. In any event, the Court then proceeds to paint a dismal picture of the corporate “domination” and Influence” that has persisted in Montana. Opinion, ¶ 29. From this discussion, the Court concludes as follows. First, voters had a “compelling interest”to enact the challenged statute in 1912 because ‘the real social and political power [in Montana] was wielded by powerful corporate managers to further their own business interests,” and the voters were fed up with the “corrupt practices” and ‘heavy-handed influence” asserted by the special interests controlling Montana’s political institutions. Opinion, ¶ 36. Second, the statute ‘has worked to preserve a degree of political and social autonomy” from “shadowy” corporate figures who seek to promote their own interests. Opinion, ¶ 37. And finally, there is still a sufficient interest to support the statute because ‘Tissues of corporate influence, sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs make Montana especially vulnerable to continued efforts of corporate control.” Opinion, ¶ 37.
¶ 103 It is patently unconstitutional, however, for the government to silence a speaker on the ground that the speaker might otherwise exert an undesired amount of ‘influence” or “control” in government and politics. Under such a rationale, any disfavored class of speakers could be censored if thought to be too ‘influential.” The Supreme Court unequivocally repudiated the notion that corporate political speech can be restricted “as a means to prevent corporations from obtaining an unfair advantage in the political marketplace by using resources amassed in the economic marketplace.” Citizens United, 130 S. Ct. at 904 (internal quotation marks omitted). Austin’s holding was founded on the same concern expressed by the Court here: that “[c]orporate *263 wealth can unfairly influence elections when it is deployed in the form of independent expenditures.” Austin, 494 U.S. at 660, 110 S. Ct. at 1398. The Supreme Court in Citizens United, however, held that “Austin is overruled, so it provides no basis for allowing the Government to limit corporate independent expenditures.” 130 S. Ct. at 913. The Supreme Court ‘Rejected the premise that the Government has an interest in equalizing the relative ability of individuals and groups to influence the outcome of elections.” Citizens United, 130 S. Ct. at 904 (internal quotation marks omitted).
¶104 ‘Favoritism and influence are not ... avoidable in representative politics,” and ‘Tr]eliance on a generic favoritism or influence theory... is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.” Citizens United, 130 S. Ct. at 910 (ellipses in original, internal quotation marks omitted). More to the point, the First Amendment prohibits “restrictions distinguishing among different speakers, allowing speech by some but not others.” Citizens United, 130 S. Ct. at 898. “ ‘In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue.’ ” Citizens United, 130 S. Ct. at 902 (quoting Bellotti, 435 U.S. at 784-85, 98 S. Ct. at 1420). The government may not bar corporations from contributing to the “open marketplace” of ideas. Citizens United, 130 S. Ct. at 906. “When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.” Citizens United, 130 S. Ct. at 908.
¶105 The Court tries to distinguish Citizens United as “decided upon its facts” and involving only federal laws and federal elections, while this case “concerns Montana law, Montana elections and ... Montana history.” Opinion, ¶¶ 11,16. Yet, Bellotti involved a state law, and the Supreme Court in Citizens United expressly noted that
[Bellotti] rested on the principle that the Government lacks the power to ban corporations from speaking. Bellotti did not address the constitutionality of the State’s ban on corporate independent expenditures to support candidates. In our view, however, that restriction would have been unconstitutional under Bellotti’s central principle: that the First Amendment does not allow political speech restrictions based on a speaker’s corporate identity.
*264 Citizens United, 130 S. Ct. at 903 (emphasis added, paragraph break omitted).
¶106 Like its influence”rationale, the Court’s “corruption”rationale is also untenable. Regardless of the history of‘bribery,” “control,” and “naked corporate manipulation” recounted by the Court, Opinion, ¶¶ 23,25,28, plaintiffs here do not challenge the statutory prohibition on corporate contributions. Rather, they challenge the prohibition on corporate expenditures. And the Supreme Court stated very clearly “that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.” Citizens United, 130 S. Ct. at 909. “When Buckley identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption.” Citizens United, 130 S. Ct. at 909. ‘The hallmark of corruption is the financial quid pro quo: dollars for political favors.” Citizens United, 130 S. Ct. at 910 (internal quotation marks omitted), ‘independent expenditures do not lead to, or create the appearance of, quid pro quo corruption. In fact, there is only scant evidence that independent expenditures even ingratiate. Ingratiation and access, in any event, are not corruption.” Citizens United, 130 S. Ct. at 910 (citation omitted).
¶107 As for the Court’s fear that invalidation of § 227(l)’s prohibition on independent expenditures by corporations will return Montana to its pre-1912 days of corruption and corporate domination, the Supreme Court answered this concern as follows:
If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by [the legislature] to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is our law and our tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech ... is not a permissible remedy.
Citizens United, 130 S. Ct. at 911 (emphases added).
C. Citizen Protection
¶108 The Court observes that allowing unlimited independent expenditures of corporate money into the Montana political process would “drastically change campaigning by shifting the emphasis to raising funds.”Opinion, ¶ 30. Direct political spending by corporations *265 could also “significantly affect the outcome of elections.” Opinion, ¶ 32. The Court explains that Montana has a small population and enjoys political campaigns marked by person-to-person contact and a low cost of advertising compared to other states. Opinion, ¶ 30. Thus, the infusion of unlimited corporate money in support of or opposition to a targeted candidate would leave the average citizen candidate “unable to compete against the corporate-sponsored candidate.” Opinion, ¶ 38. ¶109 Furthermore, Montana voters feel they do not really “count”in the political process unless they can make a material financial contribution; and they are concerned, therefore, that special interests hold sway. Opinion, ¶ 31. The percentage of campaign contributions from individual voters is much less in states that do not have restrictions on corporate spending. Opinion, ¶ 33. At present, the individual contribution limit for Montana House, Senate, and District Court races is $160 and for Supreme Court elections is $310. Opinion, ¶ 38. Thus, with the infusion of unlimited corporate money in support of or opposition to a targeted candidate, ‘Montana citizens, who for over 100 years have made their modest election contributions meaningfully count[,] would be effectively shut out of the process.” Opinion, ¶ 38. ‘Clearly the impact of unlimited corporate donations creates a dominating impact on the political process and inevitably minimizes the impact of individual citizens.” Opinion, ¶ 41. The State ‘has an interest in encouraging the full participation of the Montana electorate.” Opinion, ¶ 38; accord Opinion, ¶ 41.
¶110 While I understand the Court’s desire to protect the ability of citizen candidates to compete, and the ability of citizens to meaningfully participate and be heard in the political process, this rationale has been rejected. “ ‘[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.’ ” Citizens United, 130 S. Ct. at 904 (brackets in original) (quoting Buckley, 424 U.S. at 48-49, 96 S. Ct. at 649). The Court’s reasoning is essentially a repackaged version of the antidistortion rationale, which the Supreme Court answered as follows:
Austin sought to defend the antidistortion rationale as a means to prevent corporations from obtaining “an unfair advantage in the political marketplace” by using “resources amassed in the economic marketplace.”But Buckley rejected the premise that the Government has an interest ‘in equalizing the relative ability of individuals and groups to influence the outcome of elections.” Buckley was specific in stating that the skyrocketing cost of *266 political campaigns could not sustain the governmental prohibition. The First Amendment’s protections do not depend on the speaker’s financial ability to engage in public discussion.
Citizens United, 130 S. Ct. at 904 (citations and some internal quotation marks omitted). ‘The rule that political speech cannot be limited based on a speaker’s wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker’s identity.” Citizens United, 130 S. Ct. at 905. The Court’s citizen-protection theory is invalid under Citizens United.
D. Elected Judges
¶111 The Court next discusses Montana’s interests in “protecting and preserving its system of elected judges,” providing “an independent, fair and impartial judiciary,” and “preserving the appearance of judicial propriety and independence.”Opinion, ¶¶ 39-40. The Court fears that ‘Montana judicial elections would be particularly vulnerable to large levels of independent spending, both in terms of fairness and in terms of the public perception of impartiality.’’Opinion, ¶ 44. The Court cites Sandra Day O’Connor’s recent observation that the “‘crisis of confidence in the impartiality of the judiciary is real and growing.’ 5,[9] Opinion, ¶ 45. Noting that Montana is not immune from the influence of corporate-funded “super spender groups,” the Court concludes that Montana “has a compelling interest in precluding corporate expenditures on judicial elections based upon its interest in insuring judicial impartiality and integrity, its interest in preserving public confidence in the judiciary and its interest in protecting the due process rights of litigants.” Opinion, ¶ 45.
¶112 While I share some of the Court’s concerns,[9]
[10]1 do not believe the Supreme Court will allow a state to single out corporations as a group and prohibit them from speaking in judicial elections. First of all, as noted already, the First Amendment prohibits “restrictions distinguishing among different speakers, allowing speech by some but not others.” Citizens United, 130 S. Ct. at 898. More to the point, “the *267 First Amendment does not allow political speech restrictions based on a speaker’s corporate identity.” Citizens United, 130 S. Ct. at 903.
¶113 Secondly, Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S. Ct. 2252 (2009), which the Court cites at ¶ 43, is of no assistance. Caperton held that a judge was required to recuse himself “when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge’s election campaign when the case was pending or imminent.” 129 S. Ct. at 2263-64. As the Supreme Court later explained in Citizens United, “[t]he remedy of recusal was based on a litigant’s due process right to a fair trial before an unbiased judge. Caperton’s holding was limited to the rule that the judge must be recused, not that the litigant’s political speech could be banned.” 130 S. Ct. at 910 (citation omitted). In other words, recusal is the remedy for the concern with "protecting the due process rights of litigants” (Opinion, ¶ 45), not banning corporate speech.
¶114 Third, Justice Stevens raised this exact issue in his dissent, pointing out that
[t]he majority of the States select their judges through popular elections. At a time when concerns about the conduct of judicial elections have reached a fever pitch, the Court today unleashes the floodgates of corporate and union general treasury spending in these races. Perhaps “Caperton motions” will catch some of the worst abuses. This will be small comfort to those States that, after today, may no longer have the ability to place modest limits on corporate electioneering even if they believe such limits to be critical to maintaining the integrity of their judicial systems.
Citizens United, 130 S. Ct. at 968 (citations omitted). In response, the majority certainly could have left open the possibility that judicial elections implicate unique interests justifying restrictions on corporate expenditures in that particular context. The majority did not do so, however.[11] The majority, rather, remained firm and categorical: the First Amendment does not allow political speech restrictions based on a speaker’s corporate identity, and speech restrictions aimed at reducing the relative ability of corporations to influence the outcome of elections are invalid. Citizens United, 130 S. Ct. at 903, 904.
¶115 Lastly, the Supreme Court’s decision in White, 536 U.S. 765, *268 122 S. Ct. 2528, strongly indicates that the interests cited by the Court here are insufficient for prohibiting corporate speech in judicial elections. The Supreme Court-Justice Scalia joined by Chief Justice Rehnquist, Justice O’Connor, Justice Kennedy, and Justice Thomas-held that the Minnesota Supreme Court’s canon of judicial conduct (the “announce clause”) prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violated the First Amendment. White, 536 U.S. at 788, 122 S. Ct. at 2542. The interests asserted in support of the announce clause were the same interests asserted by the Court in the present case:
preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary. Respondents reassert these two interests before us, arguing that the first is compelling because it protects the due process rights of litigants, and that the second is compelling because it preserves public confidence in the judiciary.
White, 536 U.S. at 775, 122 S. Ct. at 2535 (citation omitted). In analyzing these interests, the White Court considered different possible meanings of the term ‘impartiality.” One meaning is the Tack of bias for or against either party to the proceeding,” which “guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party.” White, 536 U.S. at 775-76, 122 S. Ct. at 2535 (emphasis in original). Without stating expressly whether this was a compelling state interest, the Supreme Court held that the announce clause’s restriction on speech for or against particular issues did not serve the interest in assuring equal application of the law to particular parties. White, 536 U.S. at 776, 122 S. Ct. at 2535. Another meaning of impartiality is the Tack of preconception in favor of or against a particular legal view.” White, 536 U.S. at 777, 122 S. Ct. at 2536 (emphasis in original). The Supreme Court disagreed, however, with the proposition that “[a] judge’s lack of predisposition regarding the relevant legal issues in a case” is a compelling state interest. White, 536 U.S. at 777-78, 122 S. Ct. at 2536. Likewise, the Supreme Court concluded that a third possible meaning-‘openmindedness”-was an implausible basis for the announce clause. White, 536 U.S. at 778-81, 122 S. Ct. at 2536-38.
¶116 Of relevance to the present discussion, the Supreme Court observed in White that “the notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence, on its head. Debate on the qualifications of candidates is at the core of our electoral *269 process and of the First Amendment freedoms, not at the edges.” 536 U.S. at 781, 122 S. Ct. at 2538 (alteration, emphasis, and internal quotation marks omitted). Concerning the relationship between judicial elections and the First Amendment, the Supreme Court stated:
There is an obvious tension between the article of Minnesota’s popularly approved Constitution which provides that judges shall be elected, and the Minnesota Supreme Court’s announce clause which places most subjects of interest to the voters off limits.... The disparity is perhaps unsurprising, since the ABA, which originated the announce clause, has long been an opponent of judicial elections. That opposition may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about. The greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process ... the First Amendment rights that attach to their roles.
White, 536 U.S. at 787-88, 122 S. Ct. at 2541 (second ellipsis in original, brackets, citations, and internal quotation marks omitted). ¶117 Justice O’Connor made a similar point in her concurrence:
Minnesota has chosen to select its judges through contested popular elections .... In doing so the State has voluntarily taken on the risks to judicial bias described above. As a result, the State’s claim that it needs to significantly restrict judges’ speech in order to protect judicial impartiality is particularly troubling. If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.
White, 536 U.S. at 792, 122 S. Ct. at 2544 (O’Connor, J., concurring).
¶118 Perhaps most telling are the remarks of Justice Kennedy-who, as noted, authored the majority opinion in Citizens United. Justice Kennedy agreed that “judicial integrity is ... a state interest of the highest order.” White, 536 U.S. at 793, 122 S. Ct. at 2544 (Kennedy, J., concurring). He also acknowledged that a state may choose to have an elected judiciary, may strive to define those characteristics that exemplify judicial excellence, may enshrine its definitions in a code of judicial conduct, may adopt recusal standards more rigorous than due *270 process requires, and may censure judges who violate these standards. White, 536 U.S. at 794, 122 S. Ct. at 2545.
What [a state] may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer. Deciding the relevance of candidate speech is the right of the voters, not the State. The law in question here contradicts the principle that unabridged speech is the foundation of political freedom.
The State of Minnesota no doubt was concerned, as many citizens and thoughtful commentators are concerned, that judicial campaigns in an age of frenetic fundraising and mass media may foster disrespect for the legal system. Indeed, from the beginning there have been those who believed that the rough-and-tumble of politics would bring our governmental institutions into ill repute. And some have sought to cure this tendency with governmental restrictions on political speech. See Sedition Act of 1798, ch. 74, 1 Stat. 596. Cooler heads have always recognized, however, that these measures abridge the freedom of speech-not because the state interest is insufficiently compelling, but simply because content-based restrictions on political speech are expressly and positively forbidden by the First Amendment. The State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgment of speech.
White, 536 U.S. at 794-95, 122 S. Ct. at 2545 (emphases added, internal quotation marks and some citations omitted).
¶119 The principle espoused by Justice Kennedy in White-ttiat a state may not “censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer”4s consistent with the theme of the Citizens United opinion: “[I]t is our law and our tradition that more speech, not less, is the governing rule,” 130 S. Ct. at 911, and “[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations,” 130 S. Ct. at 913. A fair reading of the broad holding in Citizens United, together with a fair reading of the First Amendment principles articulated in White, leads inevitably to the conclusion that corporate independent expenditures can no more be prohibited in judicial elections than they can be in legislative and executive elections.
E. Summary
¶120 In sum, what has happened here is essentially this: The Supreme Court in Citizens United (and in White) rejected several *271 asserted governmental interests; and this Court has now come along, retrieved those interests from the garbage can, dusted them off, slapped a ‘Made in Montana” sticker on them, and held them up as grounds for sustaining a patently unconstitutional state statute. The erroneous premise underlying the Court’s entire approach here is its belief that the Supreme Court rejected the asserted governmental interests only as applied to federal elections. Opinion, ¶¶ 11, 16. Nowhere in its decision did the Supreme Court state that there was something unique about federal elections that precluded the PAC-as-an-alternative theory, the antidistortion rationale, or the anticorruption interest as justifications for restricting independent expenditures by corporations. The Supreme Court simply rejected all of these arguments outright, in broad and unqualified language. Not only that, the Supreme Court expressly noted that “Bellotti did not address the constitutionality of the State’s ban on corporate independent expenditures to support candidates. In our view, however, that restriction would have been unconstitutional under Bellotti’s central principle: that the First Amendment does not allow political speech restrictions based on a speaker’s corporate identity.” Citizens United, 130 S. Ct. at 903 (emphasis added) (citing Bellotti, 435 U.S. at 784-85, 98 S. Ct. at 1420). This Court is extremely misguided, therefore, in attempting to resurrect the rejected governmental interests under a Montana is unique” theory.
V. CONCLUSION
¶121 As demonstrated, the Supreme Court’s decision in Citizens United is clear with regard to the First Amendment’s protection of corporate political speech. Section 13-35-227(1), MCA, impermissibly restricts such speech by prohibiting corporations from making “an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.” The statute is, therefore, facially unconstitutional under Citizens United.
¶122 That said, and as noted above, I agree, at least in principle, with the arguments and concerns expressed by the Attorney General and the amici curiae supporting the State. I am deeply frustrated, as are many Americans, with the reach of Citizens United. The First Amendment has now been elevated to a vaunted and isolated position so as to endow corporations with extravagant rights of political speech and, with those rights, the exaggerated power to influence voters and elections.
¶123 Professor Howell suggests that ‘tt]he disconnect between *272 ['Citizens United’s and Caperton’s] statements about corruption” provides Montana an opportunity to preserve its Corrupt Practices Act as applied to judicial elections. See Larry Howell, Once Upon a Time in the West: Citizens United, Caperton, and the War of the Copper Kings, at 26 (available at http://mtlr.org). For my own part, I doubt that approach will be successful. In its zeal to grant corporations unlimited rights of political speech, the Supreme Court summarily dismissed its decision in Caperton with the statement that Caperton ‘is not to the contrary” because its holding “was limited to the rule that the judge must be recused, not that the litigant’s political speech could be banned.” Citizens United, 130 S. Ct. at 910 (emphasis added). This statement, along with the observations of the dissent in Citizens United and the statements by the majority and concurring opinions in White, lead me to conclude that Citizens United will eventually be applied to state judicial elections,[12] leaving recusals as the sole remedy where corporate expenditures have corrupted or biased the judge or judges at issue.[13]
¶124 Once Citizens United is imposed on elected state judiciaries, I am concerned-as were Justices Stevens, Ginsburg, Breyer, and Sotomayor; as are my former colleagues (see Amicus Brief of Former Montana Supreme Court Justices William Hunt, William Leaphart, James Regnier, Terry Trieweiler and John Warner (Apr. 27, 2011)); and as is the Court in today’s Opinion-that judicial elections will become little better than the corporate bidding wars that elections for partisan offices have already become. I have suggested, therefore, that Montana’s voters may-and probably should-amend the Montana Constitution to implement a merit system for selecting judges. See James C. Nelson, Introduction, 72 Mont. L. Rev. 1, 5-6 (2011); cf. W. William Leaphart, First Right of Recusal, 72 Mont. L. Rev. 287 (2011) (suggesting that Montana adopt an enforceable mechanism for removing Montana justices when potential bias exists).
¶ 125 'While, as a member of this Court, I am bound to follow Citizens *273 United, I do not have to agree with the Supreme Court’s decision.[14] And, to be absolutely clear, I do not agree with it. For starters, the notion that corporations are disadvantaged in the political realm is unbelievable. Indeed, it has astounded most Americans. The truth is that corporations wield inordinate power in Congress and in state legislatures. It is hard to tell where government ends and corporate America begins; the transition is seamless and overlapping. In my view, Citizens United has turned the First Amendment’s “open marketplace” of ideas into an auction house for Friedmanian[15] corporatists. Freedom of speech is now synonymous with freedom to spend. Speech equals money; money equals democracy. This decidedly was not the view of the constitutional founders, who favored the preeminence of individual interests over those of big business. Citizens United, 130 S. Ct. at 949-50 (dissenting opinion).
¶126 Second, I disagree with the premise that unlimited corporate political speech is essential to “enlightened self-government” and aids the electorate in making “informed choices.” Citizens United, 130 S. Ct. at 898,907.1 agree that “[rjhetoric ought not obscure reality.” Citizens United, 130 S. Ct. at 907. But I cannot agree that the Citizens United majority’s views reflect “reality.”For one thing, voters generally do not have the desire, much less the time, sophistication, or ability, to sift through hours upon hours of attack ads, political mumbo jumbo, and sound bites in order to winnow truth (of which there often seems to be very little) from fiction and half-truths (of which there unfortunately seems to be an endless supply).[16] The Supreme Court believes the *274 solution for false or misleading speech is more speech. Yet, an endless barrage of accusations and counteraccusations providing more fodder than fact only serves to overwhelm, confuse, and disenchant voters.
¶127 Furthermore, it defies reality to suggest that millions of dollars in slick television and Internet ads-put out by entities whose purpose and expertise, in the first place, is to persuade people to buy what’s being sold-earry the same weight as the fliers of citizen candidates and the letters to the editor of John and Mary Public. It is utter nonsense to think that ordinary citizens or candidates can spend enough to place their experience, wisdom, and views before the voters and keep pace with the virtually unlimited spending capability of corporations to place corporate views before the electorate. In spending ability, bigger really is better; and with campaign advertising and attack ads, quantity counts. In the end, candidates and the public will become mere bystanders in elections.
¶ 128 Third, with respect to the interests of shareholders in not being compelled to fund corporate political speech with which they disagree, I do not believe that participation in “corporate democracy” actually accounts for anything-nnless, of course, the objecting shareholder is an insider or owns a controlling percentage of the outstanding stock. I cannot agree that “corporate democracy” will cause big business and multinational corporations to exercise responsibly their new unlimited power to speak and spend. It won’t, because money, influence, and access are at stake. Any notion to the contrary is simply the triumph of hope over experience.
¶129 Fourth, I absolutely do not agree that corporate money in the form of‘independent expenditures” expressly advocating the election or defeat of candidates cannot give rise to corruption or the appearance of corruption. Of course it can. Even the most cursory review of decades of partisan campaigns and elections, whether state or federal, demonstrates this. Citizens United held that the only sufficiently important governmental interest in preventing corruption or the appearance of corruption is one that is limited to quid pro quo corruption. This is simply smoke and mirrors. See Citizens United, 130 S. Ct. at 961 (dissenting opinion). In the real world of politics, the “quid pro quo” of both direct contributions to candidates and independent expenditures on their behalf is loyalty. And, in practical effect, experience teaches that money corrupts, and enough of it corrupts absolutely. See e.g. Caperton, 556 U.S. 868, 129 S. Ct. 2252.
¶130 Fifth, therefore, I cannot agree with the holding that the prevention of corruption in the form of independent expenditures is *275 not a compelling state interest. There is no plausible reason why a state would not want to protect the integrity of its election process against corruption and undue influence; to do otherwise would render the fundamental right to vote a meaningless exercise. To my knowledge, the First Amendment has never been interpreted to be absolute and gloriously isolated from other fundamental rights and values protected by the Constitution. Yet, Citizens United distorts the right to speech beyond recognition. Indeed, I am shocked that the Supreme Court did not balance the right to speech with the government’s compelling interest in preserving the fundamental right to vote in elections.
¶131 At the same time, though, I am not persuaded that Montana’s experience with corruption is as “unique” as the Attorney General and this Court posit. Each state has its own corruption horror stories and has battled political and election corruption at one time or another. Even a casual examination of the daily newspaper or the evening news proves that battling political corruption is ongoing; like painting the Golden Gate Bridge, when you reach one end, you start over at the other. It should be noted that Montana’s Corrupt Practices Act was adopted in 1912 at a time when the country’s focus was on preventing political corruption, not on protecting corporate influence. Due to intervening changes in the composition and philosophy of the Supreme Court, that focus has now flip-flopped. See Zephyr Teachout, The Historical Roots of Citizens United v. FEC: How Anarchists and Academics Accidentally Created Corporate Speech Rights, 5 Harv. L. & Policy Rev. 163 (2011). Montana’s Corrupt Practices Act has become an historical-and unconstitutional-artifact, and it will have to be legislatively revised to accommodate a changed time and a changed Supreme Court. A number of our sister states have modified their laws in the wake of Citizens United (see ¶ 72 n. 4, supra), and I expect that Montana’s 2013 Legislature will, or should, be tasked with doing the same.
¶132 Lastly, I am compelled to say something about corporate “personhood.” While I recognize that this doctrine is firmly entrenched in the law, see Bellotti, 435 U.S. at 780 n. 15, 98 S. Ct. at 1418 n. 15; but see 435 U.S. at 822, 98 S. Ct. at 1439-40 (Rehnquist, J., dissenting), I find the entire concept offensive. Corporations are artificial creatures of law. As such, they should enjoy only those powers-not constitutional rights, but legislatively-conferred powers-that are concomitant with their legitimate function, that being limited-liability investment vehicles for business. Corporations are not persons. Human beings are *276 persons, and it is an affront to the inviolable dignity of our species that courts have created a legal fiction which forces people-human beings-to share fundamental, natural rights with soulless creations of government. Worse still, while corporations and human beings share many of the same rights under the law, they clearly are not bound equally to the same codes of good conduct, decency, and morality, and they are not held equally accountable for their sins. Indeed, it is truly ironic that the death penalty and hell are reserved only to natural persons.
¶133 Having said all this, I must return to the central point of this Dissent. Regardless of my disagreement with the views of the Citizens United majority, the fact remains that the Supreme Court has spoken. It has interpreted the protections of the First Amendment vis-á-vis corporate political speech. Agree with its decision or not, Montana’s judiciary and elected officers are bound to accept and enforce the Supreme Court’s ruling-in the same way that this Court demands obedience to its rulings, like them or not.
¶134 For these reasons, I dissent from the Court’s analysis in the instant case. I disagree with the Court’s decision to parse Citizens United in a fashion so as to “send a message” to, or be the next “test case” before, the Supreme Court. In my view, this approach is disingenuous. Montana is in the same First Amendment swimming pool as every other state, and the Supreme Court has dictated that its waters are expansive and deep when it comes to corporate political speech. Citizens United is the law of the land, and this Court is duty-bound to follow it. When this case is appealed to the Supreme Court, as I expect it will be, a summary reversal on the merits (see U.S. Sup. Ct. R. 16) would not surprise me in the least.
¶135 In my opinion, District Court Judge Sherlock’s well-reasoned and courageous-though politically unpopular-decision should be affirmed. I cannot agree with this Court’s determination not to do so. Therefore, I respectfully and regretfully dissent.

 1 refer to the United States Supreme Court as ‘the Supreme Court.” References to the Montana Supreme Court include ‘the Court,”‘this Court,” “we,” and “our.”

 As the Court notes, direct contributions are not at issue here. Opinion, ¶ 8.

 The task is all the more distasteful in light of Western Tradition Partnership’s questionable tactics and blatant hypocrisy. See Opinion, ¶¶ 7, 9,19; Br. of Appellants 10-11, 22-23 (Apr. 15, 2011).

 See Robert Barnes, Citizens United Decision Reverberates in Courts across Country, Washington Post (May 22, 2011) (‘The [Supreme Court’s] January 2010 decision freeing corporations and unions to spend whatever they like for and against candidates wiped out laws in 24 states banning such spending. Only Montana still wages a lonely court battle to maintain the ban.”); Natl. Conf. of State Legislatures, Citizens United and the States, http://www.ncsl.org/default.aspx?tabid=19607 (updated Jan. 4, 2011) (noting that ‘Ti]n 17 of the 24 states with laws affected by the Citizens United decision, legislation has been introduced to amend the law,” and listing the bills).

 Unfortunately, remaking cases is not a phenomenon exclusive to the Supreme Court. See e.g. Western Sec. Bank and Glacier Bancorp, Inc. v. Eide Bailly LLP, 2010 MT 291, ¶¶ 71-82, 359 Mont. 34, 249 P.3d 35 (Nelson, J., concurring in part and dissenting in part); PacifiCorp v. State, 2011 MT 93, ¶¶ 65-67, 360 Mont. 259, 253 P.3d 847 (Rice & Nelson, JJ., concurring).

 In addition to the foregoing criticisms by the dissent, I note that the Citizens United majority’s approach has also been criticized for flouting the very rhetoric that conservatives have espoused for decades against so-called ‘judicial activism.” See e.g. Erwin Chemerinsky, Op., Conservatives Embrace Judicial Activism in Campaign Finance Ruling, L.A. Times (Jan. 22, 2010); see also Reza Dibadj, Citizens United as Corporate Law Narrative, 16 Nexus 39,40-48 (2010-2011) (noting “technical concerns” and “constitutional problems” with the majority’s approach); J. Harvie Wilkinson III, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L. Rev. 253 (2009) (criticizing the same five-justice majority for not adhering to a conservative judicial methodology in Dist. of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783 (2008)).

 1 occasionally refer to §13-35-227, MCA, hereafter as ‘Section 227” or “§227.”

 An exemption for ‘Voluntary associations”is not codified in the statute. Rather, it is the Commissioner’s “policy”to except such associations from §227(1). Prior to 2003, a narrow category of nonprofit corporations was statutorily permitted to make contributions to or expenditures in connection with ballot issues, notwithstanding the general prohibition on corporate contributions and expenditures. See §13-35-227(1), (4), MCA (2001). But in light of Mont. Chamber of Commerce v. Argenbright, 226 F.3d 1049 (9th Cir. 2000), which held that corporations cannot be prohibited from making direct corporate expenditures in ballot initiative campaigns, the 2003 Legislature amended the statute accordingly. See Laws of Montana, 2003, ch. 59.

 It is somewhat ironic that the Court would cite Justice O’Connor in the context of discussing Montana’s ‘interest in protecting and preserving its system of elected judges,” given that she has been openly critical of this form of selecting judges. See Republican Party of Minn. v. White, 536 U.S. 765, 788-92, 122 S. Ct. 2528, 2542-44 (2002) (O’Connor, J., concurring).

 See James C. Nelson, Keeping Faith with the Vision: Interpreting a Constitution for This and Future Generations, 71 Mont. L. Rev. 299, 311 (2010).

 Notably, the Supreme Court eight years earlier rejected as “not a true picture of the American system” the notion that an elected judiciary is completely separate from the enterprise of “representative government.” White, 536 U.S. at 784, 122 S. Ct. at 2539.

 As reflected in the discussion of White (¶¶ 116-118, supra), and as I have previously noted (Nelson, 71 Mont. L. Rev. at 310), the system of electing judges and justices presently finds little support or esteem from the appointed federal judiciary.

 Perhaps, ironically, it will come to pass that the best way to insure that a judge or justice does not sit on a case involving a particular corporation is for the corporation to run a vigorous and expensive campaign supporting the judge’s election.

 Cf. J. Harvie Wilkinson III, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L. Rev. 253, 255-56 (2009) (‘It is the solemn duty of judges on the inferior federal courts to follow, both in letter and in spirit, rules and decisions with which we may not agree. Our oath demands it, and our respect for the Supreme Court as an institution and for the able and dedicated individuals who serve on it requires no less. But esteem can likewise be manifest in the respectful expression of difference-that too is the essence of the judicial craft.’).

 Milton Friedman: the guru, popularizer, and propagandist for unrestrained free-market economics. See Naomi Klein, Shock Doctrine: The Rise of Disaster Capitalism (Henry Holt & Co. 2007).

 For example, the Los Angeles Times recently reported that Crossroads GPS, the conservative group co-founded by Karl Rove, released an ad slamming Montana Senator Jon Tester for supporting an Environmental Protection Agency regulation on farm dust. However, one Montana cable show pulled the ad “because the network determined that it was false; the regulation was actually never proposed, and the vote cited in the ad was a procedural measure.”Tom Hamburger & Melanie Mason, Chamber of Commerce Getting Early Start with Attack Ads, L.A. Times (Nov. 16, 2011).